131040, Maria Martinez v. Marten Transport and Brian Sibley. Steven Garmisa here from Ms. Martinez. Thanks for being on. Thank you. Brian Hunt for Brian Sibley and Marten Transport. Very good. Thank you very much. And are you ready to proceed, Mr. Garmisa? Yes, ma'am. If I may proceed, Your Honors. There was no dispute that Maria Martinez had a pre-existing degenerative spinal condition when she was involved with a sideswipe collision with Mr. Sibley and the Kenworth tractor that he was driving in the railroad freight yard. They were both exiting the yard. There was a disagreement about whether or not he suddenly made a U-turn into her path or whether he was completely motionless. So there was a liability issue. One of the key issues was whether or not she suffered any damage, whether or not that sideswipe generated enough force to aggravate her pre-existing spinal condition. Before and even after the accident, the radiological studies, the x-rays, the MRIs, whatever they took, everybody agreed she had stage one spondylolisthesis, which was one vertebrae jutting forward about 25 percent out of alignment, and she had stenosis. That's what she had. It went back, and she was a frequent consumer of health care services at the Hammond Clinic. Over a period of 20, 25 years or so, she had gone there numerous times. Ten years or so before the accident, she was diagnosed with the spinal condition. She had had no, even though she had gone to the clinic about 30, 40 times in the five years before the accident, she had no complaints of back pain. More than five years, more than five and a half years before the accident, she did have. We know those facts. Yes. But you're focusing on the medical aspects. Let me ask you about Dr. Bauer. Yes, Your Honor.  Yes, Your Honor. All right. He testified based on his review of the medical records. Right. And he rendered an opinion. Is that correct? Correct. And his opinion was that the accident did not aggravate the prior condition, essentially. It was, that was part of his opinion. Yes. Okay. Part of his opinion, it did not aggravate her condition, and she would have needed surgery anyways. And so it was kind of, eventually she would have needed surgery at some undefined point in the future. So it was so fragile, her condition was so fragile, so bad, she eventually would have needed surgery. But it was so strong, so solid, that this collision could not have aggravated her preexisting condition. Although he said. Now, did you have a witness who testified to the contrary? We had her treater and the retained expert testify that to a reasonable degree of medical certainty, this accident was the first. So we have a battle of the experts. Yes. On this causation issue. Correct. Yes. All right. And you're asserting in this appeal, all right, that Dr. Bauer should not have been permitted to testify. Correct. Because reviewing the records to render some kind of an opinion on this was not sufficient. Why don't you elaborate on that? Sure. Sure. He did not, he never revealed a methodology to reach that opinion. In other words, there's, the plaintiff's experts used a differential etiology. It was a common, every day, there was actually no objection to their testimony. And it's a common thing, doctors do it in this state every day. And when they testify that it's, somebody has a condition, and what's the cause of the condition? More likely than not, you know, it's like, here are the list of possible things that could have caused it. You rule things out, you rule things in, and you say, all right, more likely than not, this was the cause. Counsel, can I ask you, is your argument that he didn't use a methodology accepted in the medical community? Yes. Or didn't use a methodology at all? He never disclosed the methodology, so he didn't use one that was generally accepted. So did you cross him on that? Mr. Farina, I don't recall exactly what the questioning was on that. But there was, the objection was that a reviewer of the medical records wouldn't say, and he had no opinion on the amount of force that was generated by this accident. And there are other experts, Dr. Harding testified, he couldn't tell how, he asked a point blank, how much force would it take to aggravate the preexisting degenerative condition? And he said, I don't know, everybody's different. So how could Bauer say, well, and he had no opinion on the amount of force that was not something that they gave him. And so it's like, was it 1G, 2G, 3G? And what amount of force? Counsel, how is this different from any of the other cases in which an expert gets up and says, to a reasonable degree of medical certainty, I'm saying that this accident could not have caused this injury. I mean, that's what these plaintiff's experts or defense experts do all the time. What distinguishes this case while you're asking us to reject Dr. Bauer's testimony? I'm not quite zeroing in on your argument around Dr. Bauer's testimony. Well, first, he never revealed a methodology. It's like, how could, it's an epistemological question. It's like, how could he know by reviewing the medical records that a slight, slight The experts do all the time. It's not unusual for an expert to review just the medical records and never examine the patient, the plaintiff is. I mean, that's not unusual. That happens all the time. The distinction I'm trying to, the distinction I think that is crucial is a distinction between we know somebody has a condition after an accident. They claim, and then they're claiming that this, the accident caused the condition. And so they're saying, well, we know she's got the condition. We know she had the complaints of acting. We know she had three surgeries. And so part, the common, the typical, the ordinary everyday testimony is, what was the likely cause? Now, he, it's the exact opposite is, this could not have caused that. Well, how do you know the medical records if she's got such a fragile Didn't he testify that he, based on his however umpteen years of experience and he's a renowned neurosurgeon and he's, you know, looked at many of these cases, so it's based on his knowledge of this particular area of science and medicine and this is his experience. How is this different from what most experts do? Because he was saying that she was eventually going to need surgery. I don't say that he could not have said eventually. Yes, she's got a degenerative spinal condition. I've seen a hundred people with that condition. Eventually 99% of them need surgery. I don't object to that. I don't say that that was wrong. But when? Next year? Five years? Ten years? What if the accident made it, aggravated that pre-existing condition and accelerated when she would have needed the surgery? Then that's a compensable injury. And he had no way of knowing. He couldn't predict the future. He would, the judge let him predict the future. So they would have had to say, oh, she would have needed the surgery even without the accident when she had the surgery. How could he say that? Counsel, let me ask you the use of your terminology in your reply brief. You refer to Dr. Hardy's opinions as fraudulent. Yes. And also say that his conduct was scientific fraud. Yes. What do you base that on? He testified that the accident, he was barred from relying on the Watson report. His report said that the accident was, the vehicle dynamics of this event were analyzed using a simulation program. That program was based on the Funk paper, which gave a mathematical formula with calculus about estimating the amount of force. By the way, was there an order on the Funk paper or not? There was no order barring use of the Funk paper. There was an order barring use of the Watson simulation, the Watson report. Mr. Watson worked for Dr. Harding's company. Mr. Watson was the fellow who did the computer simulations and then he said he took four that he thought were representative with slow speed, narrow angle, side swipe collisions and said they all generated less than 1G of force. And we said, there are so many things that were wrong with that and Judge Siriano agreed, he barred the use of the Watson report. So then, Dr. Harding's testimony is, his conclusion was based on he had to have a 1G opinion. In other words, he was saying she did not encounter more than 1G of force. And that was, he said, what she would have encountered on a daily basis. And therefore, he said there was no mechanism that would have caused these injuries. Even though he said she probably would have suffered muscle strain. I'm thinking, I drive to work every day, I don't suffer muscle strain because I stop at a stop sign or stoplight. What amount of force causes, on a daily basis, muscle strain? So... What kind of information was given to the finder, in fact, relative to what 1G of force is? Was there an explanation as to that? Just that it's the amount of force that we feel pulling down on us. But who gave that opinion? Who explained that to the fact finders? Actually, I don't know if anybody explained that. Well, that's my concern. You say that this was harmful error. And how is this even explained, again, to those folks to realize what we're talking about here? Well, I think they might have... Dr. Harding might have assumed... I think Dr. Harding might have explained that 1G is the amount of force at sea level that we feel Earth pulling us down. So that's... I think Dr. Harding probably covered that. But what Harding did, once he was barred from using the Watson report, then all of a sudden he came in with new, never-before-disclosed opinions that all sideswipe collisions generate less than 1G of force. Now, what he did is he... These were the people who worked for his company, Biodynamic Research Corporation. So he testified to that. Did you cross-examine him on that? He was questioned about that in the hallway when he was trying to justify his opinion. And Judge Siriano called everybody... I think they called everybody out to the hallway rather than send the jurors out. And Judge Siriano, over and over again, he asked him, how do you know it was 1G of force? How do you know it was less than 1G of force? How do you know? I think he asked him six different times. But again, he testified to that on the record on the stand about the 1G of force. He said all sideswipes are less than 1G. Yes. He did. He did. And you had the opportunity to cross-examine him on that. We wanted to cross-examine him using the Funk paper. And the judge said, you can't do that. Wasn't there some other way to cross-examine him besides the Funk paper? That isn't the paper I... Well, but that's what he relied on. But didn't you... It was your side that didn't want the Funk paper originally, right? It was the Watson report we didn't want him to use. And the judge agreed. So Watson... But you never asked in a motion to eliminate a bar the Funk report? No. We did not move to bar the Funk report. We did not move to bar the Funk report. We moved to bar the Watson paper, the Watson report. Watson... It was the Watson report that had... He used the formula, the calculus, the formula from the Funk paper, and he had some low, 15-degree angle sideswipes at low speeds, and they, in seven experiments, it generated less than 1G of force. Now, the Funk paper mentions the Bailey paper, which generated, with a 30-degree angle and higher speeds, generated 2.53G of force. So we're saying, well, okay. So, and by the way, there was conflicting testimony about the speeds of the vehicles, and nobody testified about the angle, 15 degrees, 30 degrees,  There was no testimony about the angle. So what Harding did, and it was, he said... And Mr. Garmisa, didn't you have a chance to ask this expert, well, how can you testify to that if there's no testimony and nothing in any of the reports about the angle? Where are you getting these numbers from? Didn't you have the opportunity to ask him that? That's kind of a basic question. Well, he admitted, here's, it was a crucial thing. He said, Judge Soriano asked, how did you come up with that? And he said, how did you come up with that, Judge Soriano asked, how did you come up with this precise number, 1G of force? And he, Dr. Harding said, that is what the literature tells me. That is what the paper says. And then later on, Mr. Farina said, there is not a single publication I'm aware of, cited by Dr. Harding, that says all side swipes are less than 1G. And Mr. Hunt said, it's included right here, and in fact, we brought a copy. And then Mr. Farina said, you could show me where, and Dr. Harding says, it doesn't say it in those words. But the test results. That's all in the sidebar, right? Yes. Yeah. So when he went out and gave his opinion, though, on the record, as Justice Cunningham asked, you could cross him on that question. With the FOMC paper. But there's nothing else in the world you could have crossed him on. No other scientific paper that you could have used. I mean, there's nothing else to establish that. But if that's what he used. I understand that. But isn't there some other document that said that speeds of 3.5, I believe I read somewhere, are involved in side swipes as well? Some other document that was involved in the trial? But he didn't testify he was relying on that. So Mr. Farina wanted to cross examine him based on the paper he relied on. And he said, is this the paper? And he said, he said he could tell that all side swipes are less than 1G. And it was like, and he said, it doesn't say that in those words. But the paper he was relying on, he admitted that he was extrapolating from the FOMC paper. And. And you didn't put out an expert to debunk his testimony relative to the 1G? No, we never thought that he'd be permitted to testify. Because it's like, once the Watson report was out, when you read his report, the Watson report was the basis for his opinion that it was less than 1G. Then the Watson report was fired and the judge said, you can't use the Watson report to justify 1G. And all of a sudden he said, oh, all side swipes generate less than 1G. And why did he have Watson do these simulations? And why did he say in his report that the Watson paper was the, that they used the simulation from Watson to justify, to come up with the 1G? So what we're saying is he came up, Dr. Bauer came up with several opinions, Dr., excuse me, Harding, came up with several opinions that were never disclosed before trial. He never disclosed before trial that his opinion is that all side swipe collisions, if we had known, if there had been fair warning, if he had said in his 213 report, every side swipe collision generates less than 1G of force, then we would have known. Hire an expert. But because he relied on the Watson report, and once the Watson report was out, it was, you know, reasonable to assume he's not going to be able to testify that this was less than 1G. And all of a sudden he came up with something that he didn't say anywhere in his report or deposition. It was less than 1G. And even if it was less than 1G of force, he, in his second deposition, in the first deposition, Mr. Farina, he asked him, can a side swipe collision, can trauma aggravate preexisting degenerative spinal condition? And he, and Mr. Hunt instructed him not to answer. And of course, a couple weeks later, a judge said, no, he's got to answer the question. Second deposition, he asked Dr. Harding, can trauma aggravate preexisting spinal condition, degenerative condition? He said, if sufficient force is applied. And then Mr. Farina's follow-up question was, how much force would aggravate her preexisting degenerative condition? And Dr. Harding said, I don't know. Everybody is different. Now, let's move. Do you agree that everything you're pressing in this case is an issue about admission of evidence? Yes. Our standard review is what? Deferential. Except for, I generally accept, if some methodology is generally accepted, and that's de novo review, as I understand it from the Supreme Court decision. But let's say, globally, most of this case is abuse of discretion, isn't it? And how did the judge abuse his discretion? He abused his discretion because he made a big mistake. He, and I'm afraid to say, I saw it here this morning, there was a lingering confusion about the difference between the Watson report and the Funk paper. The Watson report was barred, not the Funk paper. So Judge Suriano, and it didn't come out until he made his comments in denying the post-trial motion, he was, the Funk paper wasn't used for anything in this case except it was a footnote. And he said, and I barred use of the Funk, and he said he barred use of the Funk paper. And I was like, oh, my God. And I was like, he didn't bar use of the Funk paper. But even so, Mr. Germist, I think what we were asking is, couldn't you have found some other creative way to cross-examine this man on things that he was saying that you felt were not properly based on science or based on anything that was, any of the reports that had been admitted? You know, I am still trying to find out why didn't you find some way to cross-examine? That's what lawyers do. I agree. It would have been possible to get an expert to say, that's not true. I agree. But we were entitled to fair warning that that was going to be the opinion he revealed for the first time at trial. Did you get a chance to depose him ahead of time? What? Did you depose him? He was deposed twice. But he was not asked. I'm sorry. And this never came up? No. Because he never said all side-swipe collisions generate less than one G of force. That's not in his report. So why follow that? Why would anybody have asked that? It's like, do you have any opinions that you haven't disclosed? That's what we're saying. Farina should have asked him, do you have any opinions you didn't disclose about amount of force? Because he testified it was less than one G of force. He was relying on the Watson report. The judge said you can't use the Watson report. That's not. All of a sudden he comes in with a new, never-before-disclosed opinion. All side-swipes generate less than one G of force. If that had been in his 213 disclosure. What you're saying is pretty clear. I mean, did you make that argument to Judge Suriano? Yes. At no time did he ever say, because this whole case is about a side-swipe accident. Yes. And if he never testified about the amount of force that's generated in a side-swipe accident in his deposition, and now at trial, since this is what the case is about, and he's now testifying about it, I would think that Judge Suriano, that's a pretty simple concept that you'd be able to explain. And what did Judge Suriano say when you explained that to him? He, he, I think he was confused about the Funk report and the Funk paper. I'm not even talking about, I noticed I didn't mention the report once in my comments. I mean, the fact I'm talking about, this is, this whole accident is about a side-swiping. So if you put it in those terms, which is quite straightforward and simple, and explain it to Judge Suriano, I would think that you'd be able to explain it in a simple way. And I'm asking you, when you did that, if you did that, what did he say? What did he say? He just, motion denied. Counsel, did you ever make a fry challenge at trial or post-trial? There was a fry challenge to Dr. Bauer. But not to Dr. Not to Harding, no. There was a fry challenge, there was a motion in limine with a fry challenge to Bauer. He didn't use it generally except that, what's the predicting the future methodology that he applied? Is it a crystal ball, a horoscope? He reviewed the medical record. How could he, what methodology? Well, he reviews medical records. And they reveal a patient who has had a history of serious back issues. The spondylolisthiosis, sorry. And you're saying he can't predict that based on those records, if they say certain things, that the patient in the future will not require further surgery? Because the doctor, based on his knowledge, will know this person is going to age, the back changes, it realigns, all these things happen to the human body, and therefore, somewhere in the future, she's going to require surgery. That's the part I agree with. That's the part I agree with. You could tell from a doctor, he's got, said a thousand people with the same condition. Ninety-nine percent of them eventually need surgery. When? Five years? Ten years? Fifteen years? If this accident made it a situation where she needed the surgery five years, one year, two years, six months before she otherwise would have needed it, it aggravated a preexisting condition, and the defendant takes the person with the eggshell skull the way they find them, and they take the person with the eggshell spine the way they find them. And if they aggravated the injury, and how could he know that it didn't aggravate that and make that surgery required a month after she needed the surgery, she had the surgery a month or so after the accident. Well, what if she would have otherwise gone one year, two years, three years? He didn't have a methodology for predicting the future that she, in other words, in order for his testimony to be admissible, he would have been able to say, and I know exactly when she would have needed the surgery. It would have been exactly when she had the surgery. Counsel, let me ask you about Dr. Salmon. Did he disclose an opinion as to how the accident occurred? He didn't have enough information to fully reconstruct the accident, but he was able to say, based on the EDSMAC-IV computer program using calculus and Newtonian mechanics, that it could not have occurred the way Brian Sibley testified. His vehicle had to be moving. Mr. Sibley testified his Kenworth tractor was completely motionless at the time of the accident. And Mr. Salmon's testimony was all about whether or not the truck was moving, right? That's correct. Okay. Was that physically possible? And the judge barred that, saying that there were eyewitnesses who could testify as to whether the truck was moving, and therefore he could not contradict them as an expert. Oh, that's what he said. He said, you can't have an expert contradict the eyewitness. The way he phrased it is this. He said, you can have an expert contradict an eyewitness, but not solely for that purpose. He said you can't have an expert solely for the purpose of impeaching an eyewitness. That's what he said. You can't have the expert solely for the purpose of impeaching. And we're saying, well, yes. The sole purpose of Salmon's testimony was to show Mr. Sibley's testimony was not physically possible. His tractor had to have been moving. But don't Watkins and Zavala, those cases, say that you cannot contradict an eyewitness? You have to have, if you don't disclose an opinion, then you're contradicting an eyewitness. What those cases say is the experts get, they can testify, even if it contradicts the eyewitness, if they're talking about something that is beyond the knowledge of the average juror. There's some scientific principle that they're talking about, some scientific methodology that is beyond the knowledge of the average juror. Then they get to testify. If they're just, just, if they're not supplying any knowledge that's beyond the knowledge of the average juror, then they don't just get to come in and say, and make a credibility argument. But don't we have jurors all the time listen to witnesses who say, I saw the car move or I saw the car didn't move, and those eyewitnesses are competent to testify as to whether they saw a car move? Oh, absolutely. Yes. Yes. And so nobody argued that Mr. Sibley couldn't testify. Nobody argued that Ms. Martinez couldn't testify. Okay. Do you want to sum up? I think that the briefs on both sides have been exhaustive, and I would rest on my briefs. Thank you. And Mr. Hunt. I think all of the assertions of error here, but one, focus on the issue of liability. And I would assert that Judge Soriano did correctly exercise his discretion in the case law, as you all know, that he's uniquely qualified to do that because he's there seeing what's going on. And furthermore, that the credibility of the parties is something for the jury to assess. And I think that that's what they did here. And when he was ruling on the post-trial motion, I know Judge Soriano specifically said the jury could well, that this may not have been a case where experts were necessary at all when all was said and done, and that the jury was in a position to assess the credibility of the witnesses. I do want to focus, if I can, on this business about the Funk paper and the Watson report, because it is a little confusing, but there is clarity there. We do know what happened. And so in the sidebar discussion, there was a motion to bar by plaintiff's counsel regarding the Watson report and whether Dr. Harding would or would not be able to rely upon the Watson report. Judge Soriano decided that he cannot rely on the Watson report, that he would be, I think his words were, he can't just be mouthing the words of another expert if Mr. Watson is not coming himself here to speak. Fair enough. But what Watson, the only place in Dr. Harding's papers, he does say in other slides in his papers, that the amount of force that would have been exerted on Ms. Martinez would have been less than 1 G. The only place, and Dr., or rather Judge Soriano, recognized this in the sidebar, it's on page 714 and 715 of the trial transcript, and I pointed this out to him, as a matter of fact, he says, the only time they mentioned the Funk report is in the footnote to the paragraph that I barred concerning the simulation program that was developed specifically for these models. So I'm going to sustain the objection. We are not going into Funk. He's referring there to the Funk paper. So what we have then is we have a situation where, not uncommon in trial practice, where Mr. Farina has to decide, do I want the Watson report to come in and take the good with the bad that comes with that, or do I want to move to bar it, which we had a legal basis to do. It's barred. And so for him to then be asking questions about the Funk paper after now I've been, by order, deliberately have had to avoid that issue in my direct examination of Dr. Hardy would have been inherently unfair. I mean, you can't make a motion and eliminate it and then violate it between the direct and the cross-examination. And that's the argument that we made to Judge Soriano, and that's the argument that we would make here. And the reference to the 1G, the less than 1G, not only is it included in the report, the fairly exhaustive report of Dr. Hardy, but it's also included in the Bailey paper, which we, I know, is specifically referenced in our brief. And it's included in the trial record as well. I just wanted to ask, your comment says that there was a new opinion given a trial that all sideswipes are involved with less than 1G of force. Yeah. It wasn't a new opinion. It was disclosed. It was disclosed that there was less than 1G of force that was exerted on Ms. Martinez. I'm talking about all sideswipes. Because he did say less than 1G involved in this incident, but he said all sideswipes involved less than 1G. Was that a new opinion that was offered at trial? I would suggest, Judge, that that's not a new opinion because it's related to the opinion that he gave regarding this specific instance. And so whether... But it wasn't disclosed in his Harding report. Well, I cannot tell you for a fact that I know that those precise words were used in his report. I cannot tell you that for a fact. On the other hand, I would also say that I don't think the 213F is quite that restrictive in what it would allow in terms of explaining an opinion that was clearly disclosed. Mr. Hunt, let me ask you. Your opponent says that Dr. Bower's testimony that Mrs. Martinez was going to need surgery at some point in the future, but he couldn't say when. But if this accident caused her to need it at this particular point in time, isn't that compensable? Well, it would be compensable if there were testimony to that effect. But I don't think that there were... I don't think that the question, as Mr. Garmus has phrased it, is any different than it is... I'm asking my question. Yes, ma'am. And my question is, assuming that what Dr. Bower says is correct, that given the condition of this woman's disease, at some point that the level of degenerative disease in her spine was such that she would need surgery at some point in the future, if this sideswipe accident, no matter how minor it may be, caused her to have the surgery at this point in time and not some unpredictable speculative point in the future, wouldn't that be a liability situation that's compensable? I'm not so sure that's true. That if the accident caused it to happen on the date that she actually did have the surgery, that that makes it compensable. If his opinions were that she would have needed the surgery in any event. May I just... Sure. I think this is analogous to a situation that frequently occurs in the reverse, where we get a plaintiff's treating physician, or maybe an expert, to say that the person will need this surgery in the future. Can I tell you when exactly? No, I can't. I cannot tell you when they will need their knee replacement or their future back surgery, but they will need it in the future, and that gets admitted and the jury hears it. So I think that Dr. Bauer testifying that she would have needed this surgery in the future, irrespective of this occurrence, is the analog to the testimony that we often hear and that is clearly admissible with proper foundation from treating physicians regarding, or a plaintiff's medical expert, regarding future treatment or surgery. Well, that's kind of a long answer to a simple question. Okay. I apologize. Okay. So the only issue here that bears on liability at all is the testimony of, purported testimony of Mr. Salmon, who again and again in his deposition, when I asked him, do you have any opinions at all, aside from your opinion that the accident did not happen the way Mr. Sibley said, he said no, I have no other opinions about this case, I don't have enough data to formulate how the accident occurred, and I can't tell you anything else about how that happened. And the case law on that point is very clear. You cannot call an expert witness merely to impugn the credibility of an eyewitness. This would be different, this is not Zavala, where you've got an expert witness who is saying that the accident did not happen the way, I think in that instance it's the plaintiff, did not happen in the manner in which the eyewitness said, because of thus and so. And in Zavala you get a scientific explanation from the expert as to how it actually happened. And the case law is very clear, and there's a good reason why it's clear, because what we don't want is we don't want experts coming in and not giving any explanation except to say, no it didn't happen the way that the eyewitness said, or in this case, it was a party. It would be degrading our court system to allow testimony to that extent. The remainder of the plaintiff's arguments all go to liability issues, and as we state in our brief, it's not clear here at all, and I would submit that they did not ever reach liability issues. The jury concluded here, and the 3601 says the very same thing, that you need not reach issues if you conclude in favor of the defendant in terms of liability. Counsel, can I ask you about the Bailey paper? Yes, ma'am. That was something that was relied on by Dr. Harding. It was. Was it admitted? It was not admitted, no. I confess that the record is not entirely clear, although Mr. Farina was standing right next to me on page 692 and I think we brought a copy. I didn't describe it in the rush of events. I did not describe it for the record. What I was referring to was the Bailey paper. That's what I had in my hand. Well, the reason I ask this question is because in their reply, they say that the Bailey paper established that a side swipe generated 2.5 G of force, but I don't know if it was admitted or not. It was not admitted, but under Wilson v. Clark there would have been ample fodder for the plaintiff's attorney to cross-examine Mr. Harding on. He wasn't. I don't know why that decision was made, but I do know that no such cross-examination was conducted. And similarly about the angles of incidents or reflection, no such questions like that were asked. And frankly, I think a lot of what the plaintiffs now seek relief regarding here are issues regarding trial tactics and strategies that were implemented at the trial level that did not yield the result that might have been hoped for, and I would include in that specifically this business about not deposing Dr. Bauer. And frankly, my heart skipped a little when they told us they did not want to take his deposition. We offered him for deposition twice, and I didn't understand it. Our disclosure regarding Dr. Bauer we've done many, many times, and frankly could not have been clearer if we were viewing and relying on him. Every scrap of medical record, film, et cetera, that was available was given to him, and we clearly disclosed what his opinions were. So for the plaintiff to be claiming that he was surprised or that Dr. Bauer should have been barred in some way, I frankly don't understand at all. The Bailoff case clearly says that a medical expert can testify with such a basis, and that's what we did. Do you have a question? No. Counsel, sum up then, if you would please, if you wish. I don't have anything. I think we've stated our argument well in our briefs, and I'll rely on those. Thank you, Judge. Thank you. If I may, Your Honors. One of the things that Dr. Harding said when he was questioned by Judge Siriano in the hallway, and Judge Siriano asked him, how did you come up with that number? And Dr. Harding said, one of the things he said, and from the get-go, the photographs of this event tell me it's a side swipe, and a side swipe is a very low energy event, and the literature I know of, and I have experiments in which I have been involved, tell me that it was less than 1 G of force. And that, to me, I interpreted that when I read the record, and I think Mr. Farina interpreted that as saying, well, the record, the experiments in which Dr. Harding were involved were the experiments done by his colleagues at Biodynamic Research Corporation, James R. Funk, Joseph Cormier, and Charles E. Bain. So what Dr. Harding was testifying is he relied on the Funk paper. Did you ask him that during the first examination? Yes. Did you ask him what specifically are you talking about when you say the experiments that I have been involved in? Did you ask him that question? Mr. Farina didn't get to it. As soon as he mentioned the Funk paper, he said, the Funk paper is something you relied on. And Dr. Harding said, yes. No, my question is very different because he said, according to what you just read to us, he said, based on the experiments and whatever it is he had been involved in, did you ask him to elaborate what specifically are you referring to, Mr. Harding, when you talk about experiments and other things that you relied on? Then let him tell you. And if he says the Funk papers, then you have something to go on. But did you ask him that question? Or whoever was doing the cross-examination, did they ask him that question? He asked, did you rely on the Funk paper? I'm not getting into the Funk paper. That wasn't my question, Mr. Garmazzo. Okay. But that would have been the Funk paper. I don't understand. That's not my question. Okay. He did not say he relied on the Funk question according to what you just read. And I just asked whether you cross-examined him based on what you just read to me. What experiments and other things that you, whatever it is that you just read, there was nothing about the Funk papers. You extrapolated from that that it was the Funk papers. Yes. It seems to me that you could have asked him in cross-examination, tell us specifically what it is that you relied on. And if it's the Funk papers, then you have an argument. But nobody asked him that. Well, I think that the error was not letting him cross-examine Dr. Harding based on the Funk paper. He said he relied on it. Go round and round on that all day. I apologize. Maybe I'm not understanding the point. On Dr. Bauer, I think I want to make, I do want to make it clear, it's not that more than he didn't use a methodology. He provided no basis. His Rule 213 F3s provided no scientific basis for his opinions. And his disclosures gave no reason for how he was able to reach that opinion. Did you make a motion to strike or clarify on the 213s? Oh, that was Motion in Limine No. 3, I think. Okay, and the court ruled? He gets to testify. Denied. So. That was at eve of trial. Did you do that before trial? When you got the 213 responses? Not before trial. No. No. I want to try to respond to Justice Cunningham's question. And the, I think that Mr. Farina asked Dr. Harding, you relied on the funk paper. He said yes. Mr. Hunt objected. And Judge said, we're not getting into the funk paper. It wasn't relied on anything except it was listed in a footnote. And what I was trying to, the point I was trying to make is, it wasn't just a footnote. He didn't just put footnotes in there to try to make it look fancy. He put footnotes in there on what he was relying on. And what he said, from here, the only experiments he could have been involved with were the people from his friend. And he admitted, he said, you relied, Mr. Farina asked, you relied on the funk paper. He said yes. Mr. Hunt objected. Judge said, we're not getting into the funk paper. Later he explained, it wasn't used in anything other than in a footnote. I respectfully disagree. And with that, I will shut up and sit down. I tried to answer your question.  if I have been unable to. Thank you. Gentlemen, thank you very much for your presentation here today and for hearing from us. Thank you. We adjourn.